UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROSELYN BREEN,

        Plaintiff,

                              Case number 04-72463
v.                                   Honorable Julian Abele Cook, Jr.

CNA INSURANCE COMPANIES, ET AL.,

        Defendants.

## ORDER

The Plaintiff, Roselyn Breen, initiated this lawsuit to challenge the decision by the Defendant, CNA Group Life Assurance Company ("CNA"), to terminate her long-term disability benefits. On March 30, 2005, Breen and CNA filed separate motions for the entry of a judgment on the administrative record. For the reasons that are stated below, the Court (1) grants CNA's motion for judgment; (2) denies Breen's motion for judgment; and (3) affirms CNA's administrative decision which is the underlying subject of these two motions.

I.

Roselyn Breen served as a Customer Service Representative at Carhartt, Inc. ("Carhartt") from September 1975 until July 8, 1997. By virtue of her employment, Breen participated in a Group Long Term Disability Plan ("the Plan") that had been issued by CNA. On July 11, 1997, she took a leave of absence from her employment to undergo surgery for the removal of an acoustic neuroma, a benign tumor which runs from the brain to the inner ear.[1] Administrative Record

---

[1] One medical dictionary defines an acoustic neuroma as follows:

    a progressively enlarging, benign tumor, usually within the internal auditory canal

("AR") 0238. During a medical procedure at the University of Michigan Medical Center, Breen's surgeons excised most of the tumor. However, a portion of the tumor, which had attached to her facial nerve, was left intact in an effort to prevent the development of a permanent facial paralysis. AR 0043.

Notwithstanding her surgery, Breen continued to experience persistent headaches and a loss of balance. She also lost all sense of hearing in her right ear. AR 0046. On January 8, 1998, Dr. H. Alexander Arts, Breen's primary treating physician, advised her that she should remain off work until March 2, 1998. AR 0240. Shortly thereafter, Breen's request for long-term disability benefits was approved by CNA. AR 0226-27. In its letter, CNA indicated that Breen was entitled to receive disability benefits for a period of 36 months which was contingent upon her showing that she was completely disabled. AR 0226. Breen was also advised by CNA that her benefits would continue beyond this 36 month period "only if [she is] totally disabled from any occupation for which you are or become qualified by education, training or experience up to the maximum period payable as stated in the policy." *Id.*

On February 12, 1998, Dr. Donald A. Ross, a surgeon and colleague of Dr. Arts, noted that Breen had "remained disabled from her headaches and cannot return to her job until we get these [headaches] under control." AR 0050. At the time, Dr. Ross, after prescribing some medication for her headaches, suggested that she make an appointment at the Michigan Head-Pain and

---

arising from Schwann cells of the vestibular division of the eight cranial nerve; the symptoms, which vary with the size and location of the tumor, may include hearing loss, headache, disturbances of balances and gait, facial numbness or pain, and tinnitus.

DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1130 (28th ed. 1994).

Neurological Institute ("MHPNI").  *Id*.  Although Breen took the medication, she did not make an appointment at the MHPNI.

On February 18, 1998, Breen, citing her medical condition, advised CNA that she would be unable to return to work until the following year.  AR 0223.  When CNA sought information from Dr. Arts to substantiate Breen's claim of disability, he responded with a teaching physician's note (dated February 12, 1998), which made reference to Breen's complaints of "near constant headache" and "continued unsteadiness and occasional falls."  AR 0215.  Notwithstanding these maladies, Dr. Arts reassured Breen "that many of these symptoms should continue to improve with time."  *Id.*  Like Dr. Ross, Dr. Arts recommended that Breen treat her headaches at the MHPNI.  *Id.*

In July of 1998, Dr. Arts informed CNA that Breen was totally disabled.  However, it was also his view that he expected Breen to "recover sufficiently to perform [the] duties" of her occupation within a period of four to six months.  AR 0191.  Two months later, Breen met with Drs. Ross and Arts, both of whom reflected upon her complaints of headaches and episodes of imbalance.  AR 0172.  Dr. Arts summarized his opinion as follows:

> Ms. Breen's residual tumor appears to be stable.  She continues to have complaints of headache and motion-provoked disequilibrium.  In terms of the disequilibrium, we will refer her for our vestibular rehabilitation program, which I believe will be beneficial for her.  In terms of her headache, Dr. Ross and I thought it would be wise to give her a trial of anti-migrainous therapy.  Towards this we gave her a prescription for Midrin and suggested she follow up with a neurologist close to home for other options should this fail.

AR 0148.  Shortly thereafter, Breen informed Dr. Arts that she had not participated in the rehabilitation treatment.  AR 0149.

In December of 1998, Breen applied for, and received, an award of social security disability

3

benefits. AR 0032. According to the administrative law judge, the medical evidence supported a finding that she "does not possess the residual physiological and psychological functional capacity to perform sustained competitive work activities." *Id*.

Following a visit with Dr. Arts, Breen submitted an updated claim to CNA on March 31, 1999, which included a reassertion of her belief that she could not return to work. AR 0162. On the claim form, Breen indicated that (1) she was experiencing an increased pain in her face and jaw and (2) her right eye had a tendency to close and tear whenever she ate. *Id*. At the same time, Breen acknowledged that she regularly played with her dogs, planted flowers, and washed dishes and clothes at home. *Id*. Dr. Ross also completed a portion of the claim form, in which he opined that Breen's progress had become stable and that she was ambulatory. AR 0163. However, it was his continuing belief that Breen was totally disabled, and could not answer the phones (due to her poor hearing) or complete any office work. *Id*. Dr. Ross did not respond to those questions regarding Breen's future prognosis and ability to return to work. *Id*.

During the summer months of 1999, Breen, apparently dissatisfied with the progress of her rehabilitation, sought alternative treatment for her headache and loss of balance. She first underwent physical therapy at a local hospital. AR 0120. According to her therapist, Breen's rehabilitation potential was "good." *Id*. Nevertheless, she discontinued her therapy after one month. AR 0121. Breen also contacted Dr. Randy L. Gehring of the Eastside Neurosurgery, PC, whom she hoped would provide her with second opinion regarding her ailments. At the conclusion of his evaluation, Dr. Gehring wrote that Breen has a "very mild residual neurological deficit including slight right facial nerve difficulty and some minimal unbalance." AR 0135. However, Dr. Gehring wrote that Breen was "limited" by (1) her lack of exercise and (2) depression. AR

0136. He opined that Breen's depression "has [a] relationship to her headache and also to the fact that she simply has not been able to make any reasonable functional recovery after the surgery." *Id*. It was his conclusion that

> [s]he is getting good follow-up from the standpoint of the acoustic neuroma and, fortunately, will probably never had any additional problem through the course of the rest of her life. I think efforts should be made to increase her overall function and, if at all possible, to get her back to work.

*Id*.

Despite Dr. Gehring's cautionary comments, Breen submitted another supplemental disability claim form to CNA on December 21, 1999, along with a note from Dr. Arts, who said that (1) she was still disabled and (2) he was unable to render a date when she would be able to return to work because of her "chronic daily headache and ongoing dizziness." AR 0142-0143.

In May 2000, Breen returned to the University of Michigan Medical Center to be evaluated by Dr. Arts. While there, she underwent an MRI which disclosed no abnormalities and, in fact, demonstrated that her tumor had regressed. AR 0096. Dr. Arts, believing that Breen might be suffering from migraine headaches, encouraged her once again to consult with the medical staff at the MHPNI. *Id*. Dr. B. Gregory Thompson, a neurosurgeon, reiterated Dr. Arts' opinion that Breen might be suffering from migraine headaches. AR 0095.

On September 25, 2000, Dr. Arts, acting in response to a request by CNA, submitted a supplemental physician's statement, in which he reiterated his view that Breen's medical condition included complications such as "chronic headache, disequilibrium." AR 0065. However, Dr. Arts expressed the belief that, although Breen did not show evidence of any physical limitations, her prognosis for recovery was "poor." *Id*.

As the initial thirty-six month period neared an end, CNA continued its review of Breen's

5

medical condition. In October 2000, Dr. Arts, in responding to a questionnaire from CNA, was asked what, if anything, would preclude his patient from "sitting for extended periods, talking on the phone, or entering data into a computer." AR 0059. He responded, "Episodic headache." *Id.* He also noted that "there is no way that I am aware of to document headache [sic]." *Id.* It was his conclusion that she has "headaches which may make it difficult or impossible to perform her duties." *Id.*

CNA forwarded Breen's case file to Dr. Eugene Truchelut,[2] who, after reviewing the medical evidence, concluded:

> I do not see any current medical information which would clearly exclude the claimant from performing low-level work activities. I do not see any recent physical or radiological findings which would support a complete functional impairment. Given what is available here, it might be reasonable to exclude the claimant from hazardous workplace environments, but I note that she is driving an automobile, according to the vocational report.

AR 0055.

On October 17, 2000, a vocational assessment of Breen's condition, which was conducted by Bob Cirnigliaro at the behest of CNA, cited the opinions of Drs. Arts and Truchelut extensively. AR 0057. According to the report, Breen was able to participate in a variety of activities such as walking, driving a motor vehicle, washing dishes, vacuuming her home, and washing clothes. *Id.* On the basis of this assessment report, Cirnigliaro concluded that Breen possessed the functional capacity to work as (1) a telephone sales representative in the service industry, (2) an assembler of small parts in the manufacturing industry, and (3) a packager of small parts in the manufacturing industry. *Id.* Cirnigliaro forwarded this evaluation to Dr. Arts who did not respond. AR 0056.

---

[2]The record does not indicate if Dr. Truchelut is a physician who is affiliated with CNA.

On January 9, 2001, CNA advised Breen of its decision to terminate her long-term disability benefits with an effective date of February 6, 2001. AR 0052. This letter, citing the conclusions of vocational manager Cirnigliaro, stated that "the medical and vocational documentation in your file does not support that you remain disabled from any occupation at this time." *Id.* Two weeks later, Breen, through her attorney, filed an administrative appeal of CNA's decision, noting in particular that Breen had received a favorable award of benefits from the Social Security Administration ("SSA"). AR 0026. Her appeal was denied by CNA on March 7, 2001. AR 0019.

Two years later, on February 18, 2003, Breen filed a request to submit a new claim to CNA based upon her deteriorating health. AR 0018. This request was rejected, with CNA noting that Breen's failure to return to work at Carhartt rendered her ineligible to receive benefits. AR 0016.

This lawsuit followed on July 2, 2004, with Breen alleging that CNA and Carhartt had (1) wrongfully denied her benefits under the Employee Retirement Income Security Act, 29 U.S.C. § 1132(a)(1)(B) and (2) breached their contractual obligations under the Plan. On January 4, 2005, Carhartt was voluntarily dismissed from the lawsuit. The parties subsequently agreed to file motions on the administrative record pursuant to *Wilkins v. Baptist Healthcare Sys., Inc.,* 150 F.3d 609 (6th Cir.1998).

## II.

As an initial matter, the Court recognizes that Breen's contract claim is preempted by ERISA. The relevant preemption clause states that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to an employee benefit plan." 29 U.S.C. § 1144(a). The Supreme Court has interpreted this clause as preempting any state law claim that would allow employee benefit plan beneficiaries to "obtain remedies under state law that Congress rejected in

7

ERISA." *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 54 (1987). This interpretation reflects the intent of Congress "that the civil enforcement provisions of ERISA § 502(a) be the exclusive vehicle for actions by ERISA-plan participants and beneficiaries asserting improper processing of a claim for benefits." *Id.* at 52. The Court of Appeals for the Sixth Circuit ("Sixth Circuit") has "recognized the broad sweep of [ERISA's] preemption provision in relation to state law claims based upon an improper denial of benefits, noting that 'virtually all state law claims relating to an employee benefit plan are preempted by ERISA.'" *Ramsey v. Formica Corp.*, 398 F.3d 421, 424 (6th Cir. 2005) (citing *Cromwell v. Equicor-Equitable HCA Corp.,* 944 F.2d 1272, 1276 (6th Cir.1991)).

In Count II of her complaint, Breen asserts that CNA acted in violation of its contractual obligations under the Plan when it wrongfully terminated her long-term disability benefits. Inasmuch as Breen's breach of contract claim clearly "relates to" an employee benefit plan, this Court determines that it is preempted by ERISA. *See Caffey v. UNUM Life Ins. Co.,* 302 F.3d 576, 582 (6th Cir. 2002) (plaintiff's breach of contract claims are preempted by ERISA). Significantly, Breen does not challenge this argument in her pleadings. Accordingly, CNA is entitled to judgment as a matter of law on Count II of Breen's Complaint.

III.

Turning to Breen's ERISA claim, a federal court may review a plan administrator's denial of benefits *de novo*, "unless the benefit plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Wilkins,* 150 F.3d at 613 (quoting *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989)). Whenever a plan administrator has the discretionary authority to determine benefits, a court must review a decision

to deny an applicant's request under "the highly deferential arbitrary and capricious standard of review." *Yeager v. Reliance Standard Life Ins. Co.,* 88 F.3d 376, 381 (6th Cir. 1996).

Here, it is undisputed that CNA has the discretionary authority to determine benefits under the terms of the Plan. The applicable language of the Plan reads:

> The plan administrator and other plan fiduciaries have discretionary authority to determine Your eligibility for and entitlement to benefits under the Policy. The plan administrator has delegated sole discretionary authority to CNA Group Life Assurance Company to determine Your eligibility for benefits and to interpret the terms and provisions of the Policy.

Def.'s Mot., Ex. 3, POL 0031. The language of this Plan unambiguously confers upon CNA the discretionary authority to determine benefits. Accordingly, the Court will review CNA's decision to terminate Breen's long-term disability benefits under the arbitrary and capricious standard.

The Sixth Circuit has stated that this standard is "the least demanding form of judicial review." *Jones v. Metropolitan Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004). In *Williams v. Int'l Paper Co.,* 227 F.3d 706, 712 (6th Cir. 2000), the Sixth Circuit opined:

> When applying the arbitrary and capricious standard, the Court must decide whether the plan administrator's decision was rational in light of the plan's provisions. Stated differently, when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious.

*Id.* (internal citations and quotations omitted). At the same time, this standard "does not require [a court] to merely to rubber stamp the administrator's decision." *Jones*, 385 F.3d at 661. In conducting its review of CNA's administrative decision, the Court must limit its review to the administrative record that was available to the plan administrator when the final decision was made. *Wilkins,* 150 F.3d at 616.

### IV.

As a fundamental argument, CNA maintains that its decision to terminate Breen's benefits

was neither arbitrary nor capricious. In support of its position, CNA points to the medical evidence which ostensibly demonstrates that (1) Breen's neuroma had subsided and (2) the chronic headaches, about which she had complained, were not understood by her physicians. Breen disagrees, asserting that CNA had abused its discretion by (1) discounting her documented complaints of headache, lack of balance, and depression; (2) improperly deferring to Dr. Truchelut's medical report and the vocational assessment, both of which failed to consider certain evidence that supported a finding of disability; and (3) failing to accord weight to the decision by the Social Security Administration to award disability benefits. The Court will address these issues in turn. A.     <u>Objective Medical Evidence</u>

The critical question at issue in this case is whether Breen's medical condition sufficiently progressed or improved during the three years which followed her surgery. The post-surgery medical tests that were administered to Breen reflect an improvement in her condition. The CT scans that were conducted shortly after her surgery during the summer of 1997 and again in August 1998 did not uncover any remarkable abnormalities. AR 0049, 0172. Throughout the period following her surgery, Breen received several MRIs, all of which indicated that the portion of her tumor that had been left intact during her surgery remained at its normal size. In fact, Dr. Arts administered an MRI to Breen in May of 2000 which disclosed that her tumor had not grown but had "in fact has regressed somewhat" from a MRI examination in 1998. Thus, the objective medical evidence clearly suggests that Breen was recovering from her surgery to remove the acoustic neuroma.

However, Breen insists that this evidence, which relates to her neuroma, does not provide the basis for her claim for disability. She maintains that CNA continues "to confuse good recovery

from the surgery or well healed wound [sic] or no evidence of the tumors growth [sic] but it speaks only to the physical manifestation not any underlying residual conditions. Headaches and balance problems can't be seen." Pl.'s Reply Br. at 2. Thus, Breen submits that her claim for disability is based upon her headaches and loss of balance.

By admitting that her headaches and balance problems "can't be seen," Breen tacitly concedes that her claim for disability cannot be corroborated by objective medical evidence, such as a test or evaluation. However, according to the terms of the Plan, a claim for benefits must include "[o]bjective medical findings which support [the insured employee's] *Disability*. Objective medical findings include but are not limited to tests, procedures, or clinical examinations standardly [sic] accepted in the practice of medicine, for [the employee's] disabling condition." Def.'s Mot., Ex. 3, POL 0023 (emphasis original).

Based on a review of the administrative record, this Court concludes that Breen has failed to (1) transmit objective medical findings to support a claim of disability based upon her headaches and balance problems or (2) otherwise satisfy the terms and conditions of the Plan. Although many of the physicians' notes contain references to Breen's complaints of headache, none of them are supported by objective medical evidence, as defined by the Plan. Dr. Arts' response to CNA's vocational assessment questionnaire illustrates this deficiency. When asked if there was any clinical documentation in which he could substantiate his patient's claims of headache and unsteady gait, Dr. Arts responded by writing, "[t]here is no way that I am aware of to document headache. Her gait problems have not been documented by me." AR 0059.

Some of the physicians' notes that were cited by Breen contain references to her complaints of headache. For example, on April 13, 1999, Dr. Arts supported Breen's complaint that her

11

headaches sometimes "last all day." AR 0174. On May 25, 2000, Dr. Arts expressed the view that he was "concerned about her headaches." AR 0096. However, these documented observations merely recite Breen's own subjective complaints of headache. Unfortunately for Breen, these statements were not corroborated by any concrete medical evidence, such as some acceptable medical procedure or test. In the absence of any evidence to the contrary, the Court must that CNA acted rationally in denying her claim for benefits.[3]

B.   Dr. Truchelut's Medical Report and the Vocational Assessment

In terminating Breen's long-term disability benefits, CNA relied upon the medical evaluation by Dr. Truchelut who opined that "[he did] not see any current medical information which would clearly exclude the claimant from performing low-level work activities. I do not see any recent physical or radiological findings which would support a complete functional impairment." Breen challenges this report for several reasons. First, she submits that Dr. Truchelut's "opinion is based on a review of records and not a hands on examination." Pl.'s Mot. at 6. Second, she argues that he selectively considered her medical records and ignored those records which supported a finding of disability.

It is true that Dr. Truchelut did not personally examine Breen, unlike some of the other physicians whose records are contained in her case file. However, it is axiomatic that "plan

---

[3]Several of Breen's physicians, including Drs. Arts, Ross and Thompson, urged Breen to make an appointment for an evaluation at the MHPNI. For example, on May 25, 2000, Dr. Arts stated that he was "concerned that these headaches may actually represent migraine, and I strongly encouraged [Breen] to seek a consultation at the Michigan Head Pain & Neurological Institute." AR 0096. Significantly, Breen never made an appointment or received a consultation at the MHPNI. Breen's failure to follow her physicians' recommendations for treatment lends support to CNA's decision to terminate her disability benefits.

administrators are not obliged to accord special deference to the opinions of treating physicians." *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 825 (2003). Similarly, it is entirely appropriate for a plan administrator to consider the evaluation by a reviewing physician when determining a claim for benefits. One district court recently noted, "[u]nder the arbitrary and capricious standard, Defendant is free to disagree with the conclusions of Plaintiff's treating physician, and instead prefer the opinions of a reviewing doctor who has never examined Plaintiff so long as those opinions are reasonable and based on the evidence." *Harris v. Kemper Ins. Companies*, 360 F.Supp.2d 844, 849 (E.D. Mich. 2005).

Dr. Truchelut's opinion is consistent with the weight of the medical evidence in the administrative record. For example, Breen sought a second opinion in September 1999 from Dr. Gehring who reported that "[t]here is no suggestion of any type of residual or recurrent tumor." AR 0135. He also opined that Breen's own lack of exercise and depression had negatively affected her rehabilitation efforts. AR 0136. It was his conclusion that "efforts should be made to increase her overall function and, if at all possible, to get her back to work." *Id.* Like Dr. Truchelut, Dr. Gehring could not conclusively point to any medical evidence with which to corroborate her complaints of headaches. Instead, he noted that "[i]f she does have chronic headaches, she may need to be evaluated by a neurologist." *Id.*[4]

---

[4] In her reply brief, Breen argues that CNA, in rendering its administrative decision, failed to consider her depression. *See* Pl.'s Reply Br., at 3. Although she is correct that depression may form the basis for a disability claim, s*ee, e.g., Henderson v. Ameritech Corp.*, 2001 WL 1823813, *9 (6th Cir. Dec. 20, 2001) (unpublished), it is important to note that Breen did not register a claim of disability on the basis of her depression. Moreover, she has not submitted any clinical evidence to support this claim. *See Bucks v. Reliance Standard Life Ins. Co.*, 215 F.3d 1325, 2000 WL 659029, *4 (6th Cir. May 20, 2000) (claim for benefits based on psychiatric disability requires objective psychiatric evidence linking symptoms to totally disabling psychiatric disorder) (internal citation and quotation marks omitted). Accordingly, her claim for

13

Moreover, Dr. Thompson's evaluation of Breen supports Dr. Truchelut's analysis. In a letter in which he referred Breen to the MHPNI, Dr. Thompson noted that "[s]he has done quite well with a very good recovery of her facial nerve with only a mild synkinesis at this point." AR 0087. In response to Breen's complaints of headache, Dr. Thompson stated that "she has had persistent headaches which are *very atypical* for headaches recurring after suboccipital craniectomy." *Id*. (emphasis added). Thus, like Dr. Truchelut, Dr. Thompson could not substantiate Breen's subjective complaints of headache given her physical condition.

It is also clear that Dr. Truchelut's analysis incorporated evidence that was favorable to Breen. As an example, he was aware that on June 21, 1999, Dr. Ross had opined that Breen was totally disabled, and could neither answer the phones due to her poor hearing nor perform office work because of her disability. AR 0163. Dr. Truchelut, in assessing this evidence, reported:

> On 6/21/99, Dr. Donald Ross, the claimant's neurosurgeon, filled out a physician statement form, giving diagnosis of acoustic neuroma and chronic headache symptoms and stating that the claimant was totally disabled for her own job and any other work. No return to work date was given, although it is noted that the claimant was ambulatory.

AR 0054. Contrary to Breen's contention, Dr. Truchelut did review (but ultimately rejected) Dr. Ross' conclusions of June 21, 1999. The Court cannot conclude that CNA's reliance on this aspect of Dr. Truchelut's opinion was arbitrary and capricious. Significantly, Dr. Ross' report is devoid of any medical evidence or reasoning to support his view that Breen was completely disabled and could not return to work.

In 2003, the Sixth Circuit declared in *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d

---

a disability that is based on depression must be rejected.

161 (6th Cir. 2003):

> Generally, when a plan administrator chooses to rely upon the medical opinion of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits, the plan administrator's decision cannot be said to have been arbitrary and capricious because it would be possible to offer a reasoned explanation, based upon the evidence, for the plan administrator's decision.

*Id.* at 169.  Thus, even though Dr. Ross wrote in June 1999 that Breen was completely disabled and could not return to work, CNA, by focusing on other medical evidence – such as the MRI tests and the opinions of Drs. Truchelut, Gehring, and Gregory – did not act arbitrarily or capriciously. The Court reaches the same result with regard to CNA's administrative decision to discount Dr. Arts' opinion on this issue – in the absence of objective medical evidence – that Breen could not conduct phone or office work because of her "episodic headache."  More significantly, Dr. Arts' view that Breen could not participate in phone or office work did not preclude her from performing jobs such as a small parts assembler or packager, as indicated on her vocational assessment.  Thus, his opinion does not support Breen's view that she was completely disabled from any performing any occupation for which she was qualified by education, training or experience.

Breen also criticizes the conclusions that were reached by CNA on the basis of the  October 17, 2000 vocational assessment by its vocational manager, Bob Cirnigliaro.  Breen submits that his assessment "does not take into account [that she] has severe headaches which keep her in bed for hours at a time and sometimes last all day."  Pl.'s Mot. at 8.  Contrary to Breen's argument, this vocational assessment is consistent with Dr. Arts' opinion of September 15, 2000, in which he noted  that Breen had not exhibited any physical limitations.  This vocational report also made reference to earlier reports by Dr. Arts, as well as to the opinions of Drs. Gehring and Truchelut.  Furthermore, Cirnigliaro's assessment that Breen could perform certain non-hazardous jobs is

15

consistent with her statements that she engages in a variety of comparatively mundane daily activities (i.e., walking, driving, etc.) AR 0057. Although there are evaluations in the file which support a finding of disability, the decision by CNA, through Cirnigliaro, to focus on the weight of the evidence cannot be viewed as having been made arbitrarily or capriciously.

C.     Award of Social Security Benefits

Breen also argues that CNA's decision to terminate her disability benefits was arbitrary and capricious given her award of social security disability benefits. The Sixth Circuit recently held that "an ERISA plan administrator is not bound by an SSA disability determination when reviewing a claim for benefits under an ERISA plan." *Whitaker v. Hartford Life and Accident Ins. Co.,* 2005 WL 147076 (6th Cir. Jan. 24, 2005) (unpublished); *see also Black & Decker,* 538 U.S. at 832-33 (noting "critical differences between the Social Security disability program and ERISA benefit plans"). Moreover, Breen was awarded disability benefits from the SSA in December 1998 during the same period when she was receiving long-term disability benefits from CNA. Breen cannot logically assert that SSA's disability determination in December 1998 should affect CNA's decision to terminate her disability benefits in February 2001. Thus, this Court concludes that CNA was not required to accord special weight to the decision by the SSA to award disability benefits to Breen.[5]

---

[5]Breen cites another recent Sixth Circuit opinion, *Moon v. Unum Provident Corp.*, 405 F.3d 375 (6th Cir. 2005), for the proposition that although a district court is not bound by a finding of the Social Security Administration, it may still be relevant given the present circumstances. Breen's reliance on this case is misplaced. In *Moon*, the Sixth Circuit acknowledged that, although a plan administrator is not bound by a SSA determination, it is nevertheless part of the administrative record:

> We still must ask whether, viewing the administrative record as a whole, Unum has offered a reasoned explanation for its final decision. Dr. Watson''s letters and

V.

In summary, the recent medical evidence in the administrative record demonstrates that Breen's condition had not debilitated by February 2002 to such an extent that she was unable to perform any occupation for which she was qualified by education, training or experience. Accordingly, the Court concludes that CNA's decision to terminate Breen's long-term disability benefits was neither arbitrary nor capricious. Accordingly, the Court (1) grants CNA's motion for judgment, (2) denies Breen's motion for judgment, and (3) affirms the administrative decision by CNA to terminate Breen's long term disability benefits..

IT IS SO ORDERED.


DATED: October 12, 2005              s/ Julian Abele Cook, Jr.
       Detroit, Michigan             JULIAN ABELE COOK, JR.
                                     United States District Judge




Certificate of Service

---

notes as well as her testimony, presented in the context of a Social Security hearing, are all part of the administrative record in this case.

*Id.* at 381. Unlike the plaintiff in *Moon*, Breen has neither supplied nor cited any additional medical evidence or testimony from her Social Security proceedings to support her disability claim.

I hereby certify that on October 12, 2005, I electronically filed the foregoing with the Clerk of the Court using the ECF system, and I further certify that I mailed a copy to the non-ECF participant(s).

s/ Kay Alford

Courtroom Deputy Clerk
